UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WATERS TECHNOLOGIES CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT CARPIO III,<br><br>*Defendant*. | C.A. No.: |

**COMPLAINT**

Plaintiff Waters Technologies Corporation ("Waters" or the "Company"), by and through its undersigned counsel, hereby files this Complaint and seeks emergency injunctive relief against Defendant Robert Carpio III ("Carpio"), a former senior executive who resigned to join a direct competitor.

Waters and Carpio are obligated to arbitrate the merits of this dispute consistent with the JAMS Employment Arbitration Rules & Procedures (the "JAMS Rules"). Waters has already filed a Demand for Arbitration with JAMS seeking binding arbitration of this dispute pursuant to JAMS Rule 5. Although the merits of this case will be resolved in arbitration before JAMS, the parties expressly agreed that Waters could seek and obtain injunctive relief in a court of competent jurisdiction. Temporary and preliminary injunctive relief from this Court is, therefore, necessary and appropriate to preserve the *status quo* until the merits of this case can be fully adjudicated by JAMS.

**NATURE OF THE ACTION**

1. This action involves the departure of one of Waters' most senior executives for a competitor in breach of his contractual covenant not to compete and the duty of loyalty he owed

to Waters.

2. Waters hired Carpio in 2024 to run its largest and highest revenue division. It then installed him on its Executive Committee ("EC"), the Company's highest-level strategic and execution decision-making body, and it listed him as a Named Executive Officer ("NEO")—one of only four in the company. It also paid him more than $2 million (not counting the millions more in unvested/unrealized equity he received) over his 2 years of employment. In exchange for the seniority, compensation, and access bestowed upon him, Waters required Carpio to execute its Employee Confidentiality, Inventions Assignment, and Restrictive Covenants Agreement (the "RCA"), which, among other obligations and covenants, required Carpio to agree that upon his separation from the Company, he would not engage in any competitive capacity for a period of 12 months. The RCA is attached hereto as Exhibit A.

3. Relevant to this dispute, Waters entrusted Carpio with closing the gap between its digital revenues and those of its competitors through its enterprise-wide digital strategy, which included an e-commerce overhaul. In furtherance of that effort, Waters' CEO introduced Carpio to Thermo Fisher's CEO, in the hopes of expanding Waters' distribution partnership with Thermo Fisher via the Fisher Scientific channel—an Amazon-like e-commerce platform through which Waters sells its products.

4. But, at the same time as he was overseeing the negotiations on Waters' behalf for an agreement to expand Waters' access to the Fisher Scientific channel, Carpio was secretly making plans to join Thermo Fisher to lead its e-commerce channel, in direct competition against Waters, all in violation of his non-compete obligations under the RCA. In fact, Carpio is planning to depart Waters for its competitor while the negotiations he previously led on Waters' behalf remain ongoing. In his new role, Carpio will also be in a position to influence or determine the terms on which Waters products are sold through the Fisher Scientific critical channel, armed with complete knowledge of Waters' negotiation strategy, pricing limits, digital roadmap, and competitive vulnerabilities.

5. Worse, just prior to his announced resignation, Carpio took it upon himself to

access hundreds of Waters' most confidential documents and trade secrets, and then removed several of those files from Waters' servers. Specifically, six days before tendering his resignation, Carpio created a folder called "Personal" on his work laptop, moved 39 files into that folder, including content marked "COMPANY CONFIDENTIAL" and documents containing confidential information about Waters' growth strategies and plans (and other information)—information that would be valuable to Carpio in his new role at Thermo Fisher—and then uploaded that folder to his personal Dropbox account. Carpio later provided Waters a sworn declaration attesting that "Waters Data never passed through [his Dropbox] account," but that turned out to be factually false. And once Waters discovered this misconduct, Carpio, through his attorneys, revoked his consent to allow Waters to search his personal Gmail account and iPhone to identify, retrieve, and delete other Waters documents and data Carpio may have unlawfully taken.

6. In other words, Waters has evidence that Carpio exfiltrated confidential information, is actively obstructing Waters from identifying further exfiltration, and in the meantime, is refusing to honor his contractual non-compete.

7. Here is the timeline of relevant, key events:

- **February 11, 2026**: Waters' CEO introduces Carpio to Thermo Fisher's CEO and designates him to "lead the discussions from Waters" regarding the Fisher channel partnership.
- **May 29, 2026:** Carpio sends an email kicking off an eight-week digital acceleration project. Carpio describes the project as meaningfully advancing the company's digital channel transformation effort.
- **June 30, 2026:** Carpio meets with Lisa Witte, who formerly led the Customer Channels Group at Thermo Fisher before Carpio replaced her, apparently as part of his efforts to seek alternate employment with Thermo Fisher.
- **July 22, 2026:** Carpio reviews and revises the draft agreement between Waters and Thermo Fisher to expand Waters' access to the Fisher Scientific channel.
- **July 31, 2026**: Carpio signs his offer letter with Thermo Fisher.

- **July 31 and August 7, 2026:** Carpio participated in weekly synchronization meetings with the Waters consultant and working team regarding the status of the project. These meetings included discussions of confidential strategic priorities, and competitive positioning.
- **August 10, 2026**: Carpio searches "thermo injunction exec non compete" on his company phone.
- **August 11, 2026**: Carpio deletes his browser history on his work laptop, creates a new Chrome profile, and uploads Company confidential information to his Dropbox account.
- **August 12-17, 2026:** Carpio accesses hundreds of Waters documents, including highly sensitive documents containing trade secret and other confidential information.
- **August 17, 2026:** Carpio provides notice of his resignation from Waters.
- **August-September 2026:** Carpio refuses to honor his contractual non-compete and advises he intends to proceed with leading the Customer Channels Group at Thermo Fisher.

8. Waters has commenced arbitration against Carpio to remedy Carpio's breach of his restrictive covenants and other misdeeds, including his disloyal conduct while still employed by Waters, and the resulting rights to damages, injunctive relief, and recoupment of compensation and equity awards. But unless immediate relief from this Court is obtained in aid of arbitration, Waters will suffer irreparable injury that will render the arbitration ineffectual. Waters thus seeks a preliminary injunction to prevent Carpio from working for Thermo Fisher, in violation of his non-compete agreement, until an arbitration award issues, and to ensure Carpio's prompt return, non-use, and non-disclosure of Waters' trade secrets and nonpublic confidential information.

## THE PARTIES

9. Waters is a corporation organized under the laws of the State of Delaware, with a principal place of business in Massachusetts.

10. Carpio is a senior executive at Waters, hired on June 24, 2024. Upon information and belief, he resides in Georgia.

## JURISDICTION AND VENUE

11. Subject matter jurisdiction exists pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between Plaintiff, a Delaware Corporation, on the one hand, and Defendant, a resident of Georgia, on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest. Indeed, the loss of goodwill, revenue and confidential information Plaintiff will incur as a result of Carpio's actions, is more than $75,000.

12. This Court also has federal question subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C § 1367.

13. Venue is proper pursuant to 28 U.S.C § 1391 because the parties have specifically agreed to submit to the jurisdiction and venue of the state and federal courts located in the Commonwealth of Massachusetts for any dispute concerning enforcement of Carpio's restrictive covenants. RCA, Section 10(b).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Waters Is a Global Leader in Life Sciences and Diagnostics.

14. Waters is a global leader in life sciences and diagnostics dedicated to accelerating the benefits of pioneering science through analytical technologies, informatics, related products and services. Waters designs, manufactures, sells, and services sophisticated instruments, software, and related products that laboratories use to detect, identify, monitor, measure, and analyze the chemical, physical, and biological composition of materials in a sample.

15. Waters' core product portfolio includes high-performance liquid chromatography and ultra-performance liquid chromatography systems, mass spectrometry instruments, chemistry consumables, thermal and rheology instruments, light scattering instruments, flow cytometry instruments and reagents, microbiology and molecular diagnostic solutions, and laboratory software and informatics. Its customers include pharmaceutical and biotechnology companies developing and manufacturing drugs, industrial companies testing materials and products, and

academic and government laboratories conducting research and regulatory testing, among others. For more than 65 years, Waters has developed technologies that have become an essential part of the laboratory infrastructure supporting these industries.

## B. <u>Thermo Fisher Is One of Waters' Key Competitors.</u>

16. Waters' technologies and products—particularly those that Carpio oversaw during his time at Waters—directly compete with those of Thermo Fisher. Both companies sell competing analytical tools including mass spectrometers, chromatography columns, laboratory software, and related consumables and services to many of the same pharmaceutical, biotechnology, industrial, food, environmental, and academic customers. The competitive overlap extends across product development, pricing, market-share strategy, customer relationships, and go-to-market execution in regulated laboratory environments worldwide.

17. As a result, Waters' SEC filings identify Thermo Fisher as a "principal competitor." Thermo Fisher's SEC filings similarly identify Waters as a "principal participant" in the mass spectrometry market it operates.

18. Waters and Thermo Fisher also compete for access to customers through e-commerce and distribution channels. In recent years, Waters has refined its approach to e-commerce as part of a larger enterprise-wide digital growth strategy. As part of that strategy, Waters has sought to expand access to sell its products on the Fisher Scientific channel, an Amazon-like e-commerce platform operated by Thermo Fisher for life sciences products.

19. The Fisher Scientific channel gives Thermo Fisher valuable control over the terms, product visibility, placement, and customer experience for products sold through the platform, including competitors' products. It also allows Thermo Fisher significant market insights, such as how its competitors are marketing and pricing competing products, what strategies they are implementing to attract and retain customers—and whether they are successful—and how key scientific information is displayed and communicated to customers.

## C. Waters' Confidential Information.

20. Throughout his employment at Waters and in order to fulfill the obligations of his executive-level role, Carpio was repeatedly and extensively exposed to some of Waters' trade secrets and other confidential and nonpublic information concerning Waters' business, strategy, finances, customers, products, and competitive position (collectively, "Confidential Information"). Among other things, Carpio had access to—and more importantly, weighed in on:

- **Strategic plans:** Enterprise-wide corporate strategy, M&A pipeline and acquisition targets, market-expansion plans, competitive-positioning strategies, the company's digital and e-commerce roadmap, and its multi-stage growth pathway spanning commercial initiatives, innovation, and high-growth vectors;

- **Financial and commercial information:** Revenue forecasts, margin targets, divisional profit and loss details, pricing strategy across product lines, commercial terms and incentive structures, and cost structures not disclosed publicly;

- **Product roadmaps:** Multi-year product-development plans, launch timing, technologies under development, and product-performance objectives;

- **Personnel information:** Organizational structure, personnel assessments, succession planning, compensation information, and retention strategies; and

- **Customer information:** Customer lists, purchasing patterns, account strategies, and sentiment and relationship information.

21. Waters has developed, accumulated, maintained, and refined its Confidential Information over many years and with great effort and expense.

22. Such Confidential Information provides Waters with independent economic value and a significant competitive advantage, particularly against direct competitors such as Carpio's new employer, Thermo Fisher, who would find such Confidential Information to be extremely useful in their own efforts to compete for customers and sales, including through e-commerce and distribution channels, and expansion opportunities. Therefore, Waters makes considerable efforts to maintain its confidentiality.

23. Waters' Confidential Information is developed internally and, therefore, it is neither generally known to the public, nor can a member of the public easily duplicate it.

**D. <u>Waters' Extensive Measures to Protect Its Confidential Information.</u>**

24. In recognition of the critical need to protect its Confidential Information (particularly from a head-to-head competitor like Thermo Fisher), Waters takes many steps to protect the confidentiality of that information and to safeguard and secure access to it.

25. For example, among other things, Waters:

a. employs a designated information security department, led by a Senior Director of Information Security, to design and maintain Waters' information security program;

b. requires its employees to conduct onboarding and annual training on information security policies and standards and to annually attest to its Global Corporation Information Security Policy to emphasize the importance of protecting its confidential information. These policies, among other things, govern all aspects of the classification, treatment and use of its confidential information and the use of Waters technology systems, including its electronic communication and information systems;

c. requires all employees to use passwords to protect its internal data management systems containing confidential information;

d. limits access to its most confidential and sensitive information to those employees who have a need to know the information in order to perform their roles for Waters;

e. maintains policies that strictly prohibit employees from moving company documents to unapproved external cloud storage platforms such as Dropbox, or to external storage devices. The Responsibility for Assets Standard, the Computer Policy, and the Information Labeling and Handling Standard are examples of these policies;

f. sends departing employees offboarding information, which includes a reminder of their continuing obligations to Waters under their Employee Confidentiality, Inventions Assignment, and Restrictive Covenants Agreement, including their obligation to keep company confidential information secret (as was done with Carpio).

**E. Waters Hired Carpio as a Senior Executive and Trusted Him With Its Most Important Trade Secrets and Confidential Information.**

26. Waters hired Carpio effective June 24, 2024, as Senior Vice President of the Waters Division—its largest and most profitable division.[1] It designated him a Named Executive Officer—one of only four in the Company—indicating Carpio occupied the highest tier of corporate access. It also installed him on its Executive Committee—the central operating body under the Board, comprised only of Senior Vice Presidents, which plays a leading role in every major strategic and operating decision across all facets of the Company.

27. Waters also held Carpio out publicly as a face of the Company, including having him present directly to investors during Waters' Investors Day regarding its strategic roadmap for driving e-commerce growth, among other topics.

28. Carpio's compensation reflected the scope of his position. He was paid more than $2 million in his short tenure with the Company.

**F. Carpio Used His Position to Surreptitiously Further His Own Interests and Then Resigned to Join Thermo Fisher.**

29. Relevant to this dispute was Carpio's work to increase digital adoption and to grow sales productivity through Waters' e-commerce channel expansion. Waters entrusted Carpio with closing the gap between Waters' digital revenues and those of its competitors through an enterprise-wide digital and e-commerce overhaul. In performance of his company-wide e-commerce duties, Carpio engaged outside consultants, mapped customer journeys, and identified growth opportunities across all four of Waters' business divisions. Carpio oversaw the allocation of millions of dollars in capital expenditures directed toward a strategy projected to generate billions of dollars in revenue growth.

30. One of Carpio's key tasks included adjusting Waters' distribution strategy, leveraging new channels, and mobilizing Waters' existing distribution network. In furtherance of

---

[1] Following the Becton, Dickinson acquisition, Carpio became the Senior Vice President of the Waters Analytical Sciences division.

these efforts, in February 2026, Waters' CEO introduced Carpio to Thermo Fisher's CEO and designated him to "lead the discussions from Waters." Over the next several months, Carpio led the negotiations on Waters' behalf while the parties worked toward an agreement that would expand Waters' access to the Fisher Scientific channel.

31. These negotiations picked up in July 2026:

- **February 2026:** Negotiations, led by Carpio, began with Thermo Fisher;
- **July 22, 2026:** Carpio reviewed and revised the draft agreement between Waters and Thermo Fisher to expand Waters' access to the Fisher Scientific channel;
- **July 2026:** Carpio engaged with an external consultant introduced by Waters CEO regarding the status of the ongoing negotiations between Waters and Thermo Fisher. This presentation contained highly sensitive and confidential information concerning Waters' negotiation strategy, the terms under discussion, and the Company's objectives for the proposed agreement with Thermo Fisher.

32. Unbeknownst to Waters, at the same time as he was actively leading these negotiations, Carpio was secretly interviewing with and planning his departure to Thermo Fisher:

- **June 30, 2026:** Carpio secretly met with Lisa Witte, his predecessor at Thermo Fisher;
- **Late July 2026:** On his company phone, Carpio searched for homes in Boston (near where Thermo Fisher is headquartered);
- **July 31, 2026**: Carpio signed his offer letter with Thermo Fisher;
- **August 10, 2026:** Carpio searched "thermo injunction exec non compete" on his company phone; and
- **August 17, 2026:** Carpio resigned his employment with Waters.

33. Thus, while Waters entrusted Carpio to negotiate against Thermo Fisher, Carpio instead leveraged his access to Thermo Fisher and his senior role at Waters to seek alternate employment that would place him on the other side of the negotiating table. He did so while he was supposed to be negotiating on Waters' behalf, all with a clear understanding of the competitive

nature of the two companies. This surreptitious pursuit of his own interests at Waters' expense created a clear conflict of interest and violated Carpio's duty of loyalty.

34. On August 17, 2026, Carpio informed Waters that he was resigning his employment, effective October 4, 2026. Carpio advised that he has been hired by Thermo Fisher as Head of the Customer Channels Group.

35. The position places Carpio at the helm of Thermo Fisher's enterprise-wide e-commerce distribution strategy and at the nerve center of Thermo Fisher's competitive operations vis-à-vis Waters. The Fisher Scientific channel is not a siloed business unit; it is the enterprise-wide commercial infrastructure through which all four of Thermo Fisher's business segments go to market. Carpio will now oversee the very channel through which Waters sells its products—including the products Carpio was responsible for as the leader of the Waters Division—and the very product categories in which the companies compete head-to-head. The role is substantively identical to, and directly competitive with, the e-commerce strategy overhaul Carpio led at Waters: his responsibilities at Thermo Fisher will include marketplace terms and conditions, product visibility and placement, customer relationships, and e-commerce strategy—the very functions he performed at Waters.

36. The overlap between his former and new roles is not incidental—it is the direct consequence of Carpio's decision to leave Waters for the competitor he was negotiating against. The products, customer segments, and business channels Carpio will oversee at Thermo Fisher are the same categories of products and channels over which he had direct responsibility during his tenure at Waters. Effectively, Carpio will be in a position to influence or determine the terms on which Waters products are sold through this critical channel, armed with complete knowledge of Waters' negotiation strategy, pricing limits, digital roadmap, and competitive vulnerabilities that he obtained through his role on the EC. Carpio cannot realistically perform his new role without drawing on Waters' trade secrets and confidential competitive intelligence.

**G. <u>On His Way Out, Carpio Removed Confidential Documents Out of Waters' Secured Environment.</u>**

37. As he was planning to announce his departure, Carpio, on his own volition, accessed hundreds of documents containing Waters' trade secrets and confidential information whose details would be of significant value to a competing entity. He then put together a "transition plan" that no one asked him to prepare, which covered topics including Board level and Executive Committee materials, summaries of Waters' product roadmaps, sensitive pricing analysis and forecasting methodologies, corporate development pipelines, and other highly sensitive information.

38. Worse, Carpio removed certain of those files from Waters' secured environment. On August 11, 2026—6 days before his announced departure—Carpio moved 39 files into a folder on his work laptop that he named "personal," including content marked "COMPANY CONFIDENTIAL." Several of the files contained highly confidential information about Waters' growth strategies and plans, including specific strategic initiatives, tactical elements of such initiatives, financial metrics and goals, and details regarding Waters' personnel and governance. All of this was done in violation of Waters' data security policies.

39. Following his announced resignation, Waters made it clear that it viewed his intent to work for Thermo Fisher as a breach of his covenant not to compete. Carpio sought to provide assurances that he would not take with him any confidential information. He agreed to a forensic inspection protocol for the identification and remediation of Waters' information on his personal devices and accounts. As part of that protocol, Carpio was required to identify under oath all accounts containing any Waters Data. Carpio submitted a sworn declaration on September 2, 2026, attesting that he used a Dropbox account for "personal matters" and that "Waters Data never passed through that account." However, the results of the forensic inspection proved this sworn statement to be categorically false.

40. As a result, on September 11, 2026, Waters initiated arbitration against Carpio pursuant to the parties' agreement to arbitrate all disputes between them. Carpio's counsel

responded by "withdraw[ing] authorization" for Waters' review of Carpio's personal devices, including Carpio's personal Gmail account, even though his own declaration identifies his Gmail account as containing "some Waters Data." In fact, prior to his counsel withdrawing authorization to search his Gmail account, the parties agreed to run a limited search of Carpio's Gmail account and personal devices using agreed-upon search terms, to limit the intrusion into Carpio's personal communications. The agreed-upon search terms resulted in approximately 3,000 hits in his personal Gmail account, including over 1,000 that hit on the term "Waters." Carpio is now preventing Waters from taking any further action to delete and/or return all such Waters Data—yet another reason the Court should grant Waters a preliminary injunction.

**H. <u>Carpio's Departure Breaches His Restrictive Covenants.</u>**

41. Carpio's departure to a direct competitor of Waters in a role that will involve competitive conduct blatantly violates his non-compete.

42. Specifically, as a condition of his employment with Waters, and in recognition of the access Carpio had to Waters' most competitively sensitive trade secrets and confidential information, Carpio agreed to be bound by Waters' RCA, including undertaking that he would not "directly or indirectly, use, exploit, publish, retain, disseminate, disclose, or divulge, any Confidential Information" during or after his employment with Waters. RCA, Section 1(a). He has already violated this covenant.

43. In further consideration of Carpio's pay, benefits, and eligibility for discretionary, incentive-based compensation or equity awards (in respect of which Carpio earned millions of dollars from Waters), Carpio also agreed that following his employment with Waters, he would not directly or indirectly, "be employed by, consult with, provide any services to, participate in, or be connected in any manner with, any business whose business, goods, products, or services are (or intend to be) in competition with the Company or Group Company ("Competitive Services")." RCA, Section 4(a)(i).

44. Carpio's non-compete agreement is limited geographically and temporally. *See* RCA, Section 4(a) (limiting non-compete to one year following termination); *id.*, Section 4(b)

(limiting the Restricted Territory to the states where Carpio "provided services to the Company . . . or had a material presence or influence" during the preceding 24 months).

45. It is further limited by Section 4(c), which provides that Carpio "shall not be considered to be in violation of this Section 4 solely as a result of [his] employment with a business entity that has multiple operations so long as [he] is employed in a role that does not have responsibility for, involvement in, or other form of participation in any Competitive Services." RCA, Section 4(c).

46. This is therefore not a case in which Carpio has joined a diversified enterprise in a function isolated from competitive activity. Section 4(c) does not protect employment where the employee has responsibility for, involvement in, or participation in Competitive Services. Carpio's new role does the opposite: it places him in charge of a core commercial channel through which Thermo Fisher competes with Waters and through which Waters must negotiate access to customers.

47. Carpio expressly acknowledged that "the restrictions set forth [in the RCA] (including, but not limited to, the scope of defined terms, the time period of restrictions, and the geographical areas of restriction set forth therein) are fair and reasonable and are reasonably required to protect the legitimate business interests of the Company." RCA Section 9(a).

48. Carpio also agreed that were he to breach these covenants, Waters will be irreparably harmed by any breach and that money damages would be grossly inadequate.

49. Carpio's departure to Thermo Fisher during the restricted period therefore constitutes a blatant violation of the covenants he knowingly undertook.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract – Restrictive Covenants

50. Waters repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

51. The RCA constitutes a valid and enforceable contract between Waters and Carpio. The RCA comports with the Massachusetts Noncompetition Agreement Act. The RCA satisfies the requirements applicable to noncompetition agreements under Massachusetts law.

52. The non-compete is reasonable in time and scope, necessary to protect Waters' legitimate business interests—including its trade secrets, confidential information, intellectual property, goodwill, and customer relationships. Carpio was a senior executive who received fair and reasonable consideration for the covenant, including substantial compensation, equity eligibility, access to highly confidential information and trade secrets, and continued employment in a role of exceptional trust.

53. Carpio breached the covenant not to compete by accepting employment with Thermo Fisher, a direct competitor, in a role involving Competitive Services during the 12-month restricted period.

54. Carpio's anticipated role at Thermo Fisher falls squarely within the RCA's prohibition because it is not merely employment by a diversified company that also competes with Waters; it is employment in a senior role with responsibility for the very e-commerce channel, marketplace terms, customer access, product visibility, and competitive strategy areas in which Waters and Thermo Fisher directly compete.

55. The RCA also prohibits Carpio from using or disclosing Waters' trade secrets and confidential and proprietary information.

56. By virtue of his senior position, EC membership, and work leading Waters' digital and e-commerce strategy, Carpio had access to Waters' most highly confidential and commercially sensitive information, including, without limitation, its enterprise-wide corporate strategy, M&A pipeline and acquisition targets, market-expansion plans, competitive-positioning strategies, digital and e-commerce roadmap, revenue forecasts, margin targets, divisional profit and loss details, pricing strategy across product lines, commercial terms and incentive structures, cost structures not disclosed publicly, product-development plans, technologies under development, product-performance objectives, organizational structure, personnel assessments, succession

planning, compensation information, retention strategies, customer lists, purchasing patterns, account strategies, and relationship information.

57. Carpio also misappropriated Waters' data and confidential information when he took it upon himself to access hundreds of Waters' most confidential documents and trade secrets, and then removed several of those files from Waters' servers. Specifically, six days before tendering his resignation, Carpio created a folder called "Personal" on his work laptop, moved 39 files into that folder, including content marked "COMPANY CONFIDENTIAL" and documents containing confidential information about Waters' growth strategies and plans (and other information)—information that would be valuable to Carpio in his new role at Thermo Fisher—and then uploaded that folder to his personal Dropbox account. Carpio later provided Waters a sworn declaration attesting that "Waters Data never passed through [his Dropbox] account," but that turned out to be factually false. And once Waters discovered this misconduct, Carpio, through his attorneys, revoked his consent to allow Waters to search his personal Gmail account and iPhone to identify, retrieve, and delete other Waters documents and data Carpio may have unlawfully taken. Carpio's actions not only violated his obligations under the RCA, but they were also unlawful and in violation of the Company's data security policies.

58. By joining Thermo Fisher in a senior role leading its Customer Channels Group, Carpio has placed himself in a position where he is reasonably likely to use or disclose, whether intentionally or not, Waters' confidential information in pursuit of his duties for Thermo Fisher.

59. The threatened inevitable disclosure or use of Waters' confidential information is not speculative; it is the predictable consequence of placing Carpio in a substantially similar senior role for Waters' direct competitor. It is even more inevitable given Carpio's recent access and review of hundreds of pages of trade secrets and confidential information. Indeed, just prior to his announced resignation, Carpio reviewed documents containing:

- Summaries of Waters' product roadmaps;
- Unreleased development programs;
- Assessments of product weaknesses;

- Corporate development pipelines; and
- Other highly sensitive information that would be of significant value to a competing entity.

60. Carpio cannot purge these documents or their contents from his memory and thus will inevitably rely on them in some fashion in performing his competing role.

61. This inevitable disclosure constitutes a breach or threatened breach of Carpio's confidentiality and non-disclosure obligations and entitles Waters to injunctive and other relief, as well as damages in an amount to be determined by the Court.

**COUNT II**
**Breach of Contract – Duty of Loyalty**

62. Waters repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

63. When he agreed to be bound by the RCA, Carpio took upon himself a contractual duty of loyalty.

64. Section 6(a) of the RCA required Carpio to agree that during his employment Carpio would "not directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or could otherwise create a conflict of interest with, Employee's employment with, or duties and responsibilities on behalf of, the Company and the Waters Group Companies."

65. Carpio breached his contractual duty of loyalty by pursuing a role with Thermo Fisher at the same time as he was negotiating against them on Waters' behalf. In doing so, he created a clear conflict of interest, which he failed to disclose, risking Waters' competitive standing in the negotiations.

66. Carpio has further threatened to breach his duty of loyalty by seeking to participate in a public announcement regarding his imminent hiring at Thermo Fisher while he remains employed by Waters. Such conduct creates a clear conflict of interest and threatens to force Waters

into the difficult position of explaining why a current senior executive—one of only four Named Executive Officers at Waters—is openly announcing a move to a direct competitor. That is a breach of Carpio's contractual duty of loyalty.

67. As a direct and proximate result of Carpio's breach, Waters has suffered and will continue to suffer irreparable harm and damages in an amount to be determined by the Court.

**COUNT III**
**Breach of Fiduciary Duty**

68. Waters repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

69. As a Senior Vice President, member of the EC, and NEO, Carpio held a senior executive position and owed fiduciary duties to Waters.

70. Carpio had an obligation to act for the benefit of Waters while still employed by Waters and not to misappropriate trade secrets and other confidential information.

71. Carpio breached those fiduciary duties by, among other things, misappropriating Waters' trade secrets and other Confidential Information and secretly pursuing employment with Thermo Fisher at the same time as he was entrusted to negotiate on Waters' behalf against them.

72. Indeed, while Carpio was negotiating on Waters' behalf against Thermo Fisher, he owed fiduciary duties to negotiate the best deal possible for the Company. But, at the same time as those negotiations were occurring—in fact, just as the negotiations were picking up steam—Carpio signed an offer letter to join Thermo Fisher, thus elevating his personal interests above Waters', in violation of his fiduciary duties. Waters is entitled to recover for this breach.

73. As a direct and proximate result of Carpio's breach, Waters has suffered and will continue to suffer irreparable harm and damages in an amount to be determined by the Court.

**COUNT IV**
**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*.**

74. Waters repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

75. During the entire course of his employment with Waters, Carpio had access to Waters' trade secrets and other nonpublic Confidential Information that is of extraordinary value to Waters.

76. As set forth above, Waters expended significant amounts of time and resources to develop, accumulate, maintain, refine, and now possess certain trade secret information, including, without limitation, Board level and Executive Committee materials, product roadmaps, sensitive pricing analysis and forecasting methodologies, corporate development pipelines, strategic plans and initiatives, non-public financial and commercial information, personnel and governance information, including executive-level succession planning, and customer information, including contracts with its top customers, and other confidential information that provides Waters with a competitive edge. This information constitutes "trade secrets" under the DTSA.

77. Waters has made concerted efforts and taken reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures: employing a designated information security department; requiring its employees to conduct training on information security policies and standards and to attest to its Global Corporate Information Security Policy; requiring employees to use passwords; limiting access to its most confidential and sensitive information to those employees who have a need to know the information in order to perform their roles; maintaining policies that strictly prohibit employees from moving company documents to unapproved external storage platforms such as Dropbox; and sending departing employees reminders of the continuing obligations under their Employee Confidentiality, Inventions Assignment, and Restrictive Covenants Agreement, including their obligation to keep company confidential information secret.

78. Waters' trade secrets derive independent economic value and confer a competitive edge to Waters from not being generally known to, and not being readily ascertainable by proper means by, other companies or individuals (in Waters' industry or elsewhere) who could obtain advantage from it by virtue of its not being accessible, through proper means, to competitors who could profit from its use or disclosure. Waters provided Carpio with access to its trade secret information for the limited purpose of his use of this information during the scope of his employment with Waters.

79. These trade secrets are used in interstate commerce by Waters – a Delaware entity with its principal place of business in Massachusetts.

80. Carpio acquired Waters' trade secret information by improper means when he took it upon himself to access hundreds of Waters' most confidential documents and trade secrets, and then removed several of those files from Waters' servers. Specifically, six days before tendering his resignation, Carpio created a folder called "Personal" on his work laptop, moved 39 files into that folder, including content marked "COMPANY CONFIDENTIAL" and documents containing confidential information about Waters' growth strategies and plans (and other information)—information that would be valuable to Carpio in his new role at Thermo Fisher—and then uploaded that folder to his personal Dropbox account. Carpio later provided Waters a sworn declaration attesting that "Waters Data never passed through [his Dropbox] account," but that turned out to be factually false. And once Waters discovered this misconduct, Carpio, through his attorneys, revoked his consent to allow Waters to search his personal Gmail account and iPhone to identify, retrieve, and delete other Waters documents and data Carpio may have unlawfully taken.

81. Upon information and belief, Carpio transferred Waters' trade secret information to be used at, and/or disclosed to, Thermo Fisher in his new role, constituting further acts of misappropriation.

82. Carpio's position with Thermo Fisher is one in which Carpio's disclosure and/or use of Waters' trade secrets and other confidential information would be unavoidable and inevitable, thereby constituting further misappropriation of Waters' trade secrets in violation of

the DTSA.

83. Carpio's misappropriation of Waters' trade secrets was willful and malicious because Carpio intentionally took Waters' trade secrets by accessing and downloading mass numbers of documents containing them in the days leading up to his resignation from Waters, and after he had signed his offer letter with Thermo Fisher. Carpio's intent demonstrating his willful and malicious misappropriation was further demonstrated by his deletion of his browser history on his work laptop on the same day he uploaded Waters' confidential information to his Dropbox to avoid detection of his misconduct by Waters.

84. Unless enjoined by this Court, Carpio's misappropriation of Waters' trade secrets will cause significant irreparable harm to Waters, and Waters has no adequate or other remedies at law for such acts and threatened acts. Irreparable harm is presumed when trade secrets, such as Waters' trade secret information, have been misappropriated. As such, Waters is entitled to preliminary and permanent injunctive relief.

85. As a direct, proximate, and foreseeable result of Carpio's misappropriation of Waters' trade secrets, Waters also has been monetarily damaged in an amount to be determined, and exemplary damages are warranted in light of Carpio's malicious and willful misappropriation.

.

**COUNT V**
**Misappropriation of Trade Secrets in Violation of**
**Massachusetts Uniform Trade Secrets Act –G.L. c. 93 §§ 42, *et seq*.**

86. Waters repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

87. In his position with Waters, Carpio had access to trade secrets and other nonpublic Confidential Information that is of extraordinary value to Waters.

88. As set forth above, Waters expended significant amounts of time and resources to develop, accumulate, maintain, refine, and now possess certain trade secret information, including, without limitation, Board level and Executive Committee materials, product roadmaps, sensitive

pricing analysis and forecasting methodologies, corporate development pipelines, strategic plans and initiatives, non-public financial and commercial information, personnel and governance information, including executive-level succession planning, and customer information, including contracts with its top customers, and other confidential information that provides Waters with a competitive edge. This information constitutes "trade secrets" under the Massachusetts Uniform Trade Secrets Act ("MUTSA"), G.L. c. 93, §§ 42, *et seq*.

89. As described above, Waters has made concerted efforts and reasonable steps to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures: employing a designated information security department; requiring its employees to conduct training on information security policies and standards and to attest to its Global Corporate Information Security Policy; requiring employees to use passwords; limiting access to its most confidential and sensitive information to those employees who have a need to know the information in order to perform their roles; maintaining policies that strictly prohibit employees from moving company documents to unapproved external storage platforms such as Dropbox; and sending departing employees reminders of the continuing obligations under their Employee Confidentiality, Inventions Assignment, and Restrictive Covenants Agreement ("RCA"), including their obligation to keep company confidential information secret.

90. Waters' trade secrets derive independent economic value and confer a competitive edge to Waters from not being generally known to, and not being readily ascertainable by proper means by, other companies or individuals (in Waters' industry or elsewhere) who could obtain advantage from it by virtue of its not being accessible, through proper means, to competitors who could profit from its use or disclosure. Waters provided Carpio access to its trade secret information for the limited purpose of his use of this information during the scope of his employment for Waters.

91. Carpio acquired Waters' trade secret information by improper means when he took it upon himself to access hundreds of Waters' most confidential documents and trade secrets, and

then removed several of those files from Waters' servers. Specifically, six days before tendering his resignation, Carpio created a folder called "Personal" on his work laptop, moved 39 files into that folder, including content marked "COMPANY CONFIDENTIAL" and documents containing confidential information about Waters' growth strategies and plans (and other information)—information that would be valuable to Carpio in his new role at Thermo Fisher—and then uploaded that folder to his personal Dropbox account. Carpio later provided Waters a sworn declaration attesting that "Waters Data never passed through [his Dropbox] account," but that turned out to be factually false. And once Waters discovered this misconduct, Carpio, through his attorneys, revoked his consent to allow Waters to search his personal Gmail account and iPhone to identify, retrieve, and delete other Waters documents and data Carpio may have unlawfully taken.

92. Upon information and belief, Carpio transferred Waters' trade secret information to be used at, and/or disclosed to, Thermo Fisher in his new role, constituting further acts of misappropriation.

93. Carpio's position with Thermo Fisher is one in which Carpio's disclosure and/or use of Waters' trade secrets and other confidential information would be unavoidable and inevitable, thereby constituting further misappropriation of Waters' trade secrets in violation of the MUTSA.

94. Carpio's misappropriation of Waters' trade secrets was willful and malicious because Carpio intentionally took Waters' trade secrets by accessing and downloading mass numbers of documents containing them in the days leading up to his resignation from Waters, and after he had signed his offer letter with Thermo Fisher. Carpio's intent demonstrating his willful and malicious misappropriation was further demonstrated by his deletion of his browser history on his work laptop on the same day he uploaded Waters' confidential information to his Dropbox to avoid detection of his misconduct by Waters.

95. Unless enjoined by this Court, Carpio's misappropriation of Waters' trade secrets will cause significant irreparable harm to Waters, and Waters has no adequate or other remedies at law for such acts and threatened acts. As such, Waters is entitled to preliminary and permanent

injunctive relief.

96. As a direct, proximate, and foreseeable result of Carpio's misappropriation of Waters' trade secrets, Waters also has been monetarily damaged in an amount to be determined, and exemplary damages are warranted in light of Carpio's malicious and willful misappropriation.

**ATTORNEYS' FEES AND COSTS**

Waters seeks reasonable and necessary attorneys' fees and costs against Carpio under the DTSA and MUTSA.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Waters Technologies Corporation respectfully requests that this Court grant the following relief:

a. Enter a preliminary injunction:

i. enjoining Carpio from working for Thermo Fisher Scientific Inc. as Head of its Customer Channels Group, or any like position, pending a final award issued by the arbitrator who will resolve Waters' claims against Carpio in the arbitration that Waters has commenced

ii. enjoining Carpio from otherwise violating any of the restrictive covenants he undertook pursuant to the RCA, including directly or indirectly, using, exploiting, publishing, retaining, disseminating, disclosing, or divulging trade secrets and other confidential information of Waters, pending a final award issued by the arbitrator who will resolve Waters' claims against Carpio in the arbitration that Waters has commenced;

iii. ordering Carpio to return to Waters, within seven (7) days of entry of the Court's order, all Waters property, including all electronic storage devices, and all trade secrets and other confidential information of Waters in his possession, custody, or control, including without limitation all emails, communications, and other

documents that at any point were stored on any Waters device, network, or system, whether in hard copy or electronically stored, and any photos or copies or derivations thereof, as well as all usernames and passwords for all online accounts that Carpio used for work purposes;

iv. enjoining and restraining Carpio, and any person in active concert or participation with him who receives actual notice of the Court's order, from using any of Waters' trade secrets or other confidential information in any way and for any purpose and from disclosing Waters' trade secrets and confidential information to anyone not authorized to receive such information. This includes the use or disclosure of any information or documents derived or obtained from any of Waters' trade secrets or other confidential information;

v. ordering Carpio, and any person in active concert or participation with him who receives actual notice of the Court's order, to preserve and hereby enjoining him or them from transferring, altering, destroying, deleting, concealing, or making inaccessible any of Waters' trade secrets, other confidential information and property, or any other information or materials that may be relevant to this litigation, including all such electronically-stored data and information;

vi. ordering Carpio to file a declaration attesting that he has returned to Waters all property and information subject to this Court's order within five (5) days from the entry of the order; and

vii. enjoining Carpio from engaging in any conduct to circumvent the restrictions set forth in the order.

b. For such further relief as the Court finds just and proper.

Respectfully submitted,

WATERS TECHNOLOGIES CORPORATION,

By its attorneys,

*/s/ Nicole Corvini*
Nicole Corvini, BBO No. 670587
*ndaly@beckreed.com*
Russell Beck, BBO No. 561031
*rbeck@beckreed.com*
Heather Krauss, BBO No. 644457
*hkrauss@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665

Blair J. Robinson *(pro hac vice motion forthcoming)*
*blairrobinson@paulhastings.com*
Eric Distelburger *(pro hac vice motion forthcoming)*
*ericdistelburger@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

Dated: September 14, 2026